PRUDENCE CO., Inc., v. FIDELITY & DE-
POSIT CO. OF MARYLAND et al.

District Court, S. D. New York.
June 6, 1934.

Alfred T. Davison, of New York City (Martin A. Schenck, Orrin G. Judd, and Ralph C. Williams, Jr., all of New York City, of counsel), for plaintiff.

Thomas E. White, of New York City (Joseph F. Murray, of New York City, of counsel), for defendants.

GALSTON, District Judge.

By stipulation this cause was tried by a jury of one.

On September 24, 1929, the plaintiff and the Central Park Properties, Inc., entered into a building loan agreement, by the provisions of which the Prudence Company agreed to lend the sum of $6,650,000. This loan was to be secured by a bond and mortgage as a first lien upon premises on the south side of West Fifty-Ninth street in the city of New York.

The borrower agreed to erect, according to the plans and specifications submitted and approved in writing by the Prudence Company, a modern forty-story and basement fireproof hotel containing 1,269 rooms and 687 bathrooms, together with the usual equipment installed in buildings of that type, but not including hotel furniture and furnishings. This building will hereafter be referred to as "The Essex House."

It was agreed that the building was to be completed and ready for occupancy by December 16, 1930.

The building loan agreement contained the following clause: "The Borrower shall furnish to the Lender a surety bond in the amount of $3,000,000., in a company satisfactory to Lender, to be in form and contents satisfactory to Lender, conditioned upon and guaranteeing completion of said building within the time hereinafter specified in strict accordance with said plans and specifications and this agreement and free from claims of liens."

In pursuance of the foregoing provision of the building loan agreement, the borrower procured for the plaintiff the bond of the defendants herein in the amount of $3,000,000, conditioned upon and guaranteeing the completion of the building described in the building loan agreement not later than the 16th day of December, 1930, in strict accordance with the plans and specifications of the building loan agreement and free from claims of liens.

The surety bond contained, among others, the following provisions:

"And said building loan agreement and all and singular the terms thereof are hereby made a part of this bond by reference thereto with the same force and effect as if set forth in full in the body hereof."

"No changes from said plans and specifications above referred to, including any changes in the design or cubic contents of or the materials or equipment in said building or in the performance of the work of construction of said building, and no delay, neglect or failure of the Obligee to proceed promptly or otherwise to enforce the completion of said building by the Principal or enforce any remedy it may have against the Principal, and no act done or omission of or action or proceeding taken by the Obligee in case of any default by the Principal, shall in any respect release or relieve the Principal or Surety from their obligations hereunder (which shall also include all such changes.)"

At or about the time of the execution of the building loan, advance payments totaling $3,250,000 were made to the borrower. From then on various other advances were made, bringing the total to $6,650,000, of which the sum of $75,000 was deposited by the Central Park Properties, Inc., with the Prudence Company for the purpose of meeting various expenditures in connection with the completion of the building; and the said sum of $75,000 was thereafter applied by the plaintiff on account of the said principal sum of $6,650,000.

The plaintiff's cause of action arises out of the failure of the borrower to complete the building and have it ready for occupancy as a modern hotel on or before December 16, 1930.

On December 23, 1930, the Central Park Properties, Inc., abandoned the completion of the building, leaving it in an unfinished state. The plaintiff also alleges that the Central Park Properties, Inc., did not construct and complete the building in accordance with the plans and specifications of the building loan contract; and the defendants, it is alleged, have not made good the defaults on the part of the Central Park Properties, Inc. In consequence, the plaintiff employed contractors to complete the building in general accordance with the plans and specifications of the building loan agreement, and it was made ready for occupancy on or about the 1st day of October, 1931.

The plaintiff alleges that it has expended certain sums for labor and materials in com-

pleting the building; and that also by reason of the omissions of labor and material called for by the building loan agreement and the plans and specifications, and, because of substitutions made by the Central Park Properties, Inc., of inferior materials, plaintiff was additionally damaged, in that it was compelled to pay taxes, and suffered loss of interest, making total damages of $830,086.69, which sum includes interest to May 15, 1934.

The defendants interposed a general denial and also set up ten separate defenses, of which, however, the first, second, third, fourth, fifth, seventh, eighth, and ninth were stricken out on plaintiff's motion before trial. Prudence Co. v. Fidelity & Deposit Co. of Maryland et al. (D. C.) 2 F. Supp. 454.

The sixth defense alleges that on the 5th day of December, 1930, the plaintiff and the Central Park Properties, Inc., agreed that all the work required for the completion of the building provided for in the building loan agreement had been done except work which could be completed for the sum of $75,000; and that by the deposit of that sum the liability of the defendants on their bond was released and discharged.

The tenth defense is that the omissions of items and the substitution of materials, of which the plaintiff complains, were made with the knowledge and approval of the plaintiff; and that accordingly the plaintiff waived strict performance of the terms and provisions of the building loan agreement, and the plaintiff is estopped thereby from alleging that these omissions and substitutions were contrary to the plans and specifications and to the said building loan agreement.

At the opening of the case, the defendants' counsel asserted a defense of fraud. This defense was not proved.

Exhibit 84 sets forth a list of payments made by the Prudence Company in completing the building. The reasonableness of some of these items is challenged. It includes a painting expenditure of $72,882. It is claimed that this is an excessive amount; and that at the time of final payment by the Prudence Company, the painting was separated from the other items, and it was estimated that $25,000 would cover the cost of completion of the painting. Defendants also emphasize the fact that the plaintiff's inspectors reported that $14,000 would be sufficient to complete the painting. As against that, however, we have the testimony that what was done was in strict compliance with the provisions of the building loan agreement and the plans and specifications, with the exception that there was included a removal of molding and repairting necessitated by such removal. However, the net figure of $71,650 is arrived at after having made suitable deduction for such labor and material as were not called for by the plans and specifications. It nowhere appears that either Schermerhorn or Billsborrow, plaintiff's inspectors, submitted detailed estimates in respect to the job, at the time that it was estimated that but $14,000 would be required to complete the painting. It is argued that this and other items were reckless expenditures because the total amount so expended was so vastly in excess of early estimates.

■ It is unreasonable to believe that the Prudence Company deliberately went out of its way to complete the building at a cost in excess of that actually demanded by the condition of the building when it was abandoned by the Central Park Properties, Inc. The best evidence of the cost is what the Prudence Company was compelled to pay; and, in the absence of proof that the same work could have been done at a substantially lower figure, and particularly in the absence of any proof that the work was not justified by the plans and specifications and the building loan agreement, and since the plaintiff has sustained its burden of proof, the figure as to the painting must be accepted. This same principle must be followed in respect to all the other items entering into the schedule of completion. The third paragraph of the bond is important in this regard:

"Third: Should the Obligee give the Surety written notice of any default of the Principal as aforesaid, and (1) should the Surety for twenty days after receipt of such notice fail to diligently proceed with or procure others to diligently proceed with the construction and completion of said building and the supplying and installation of said equipment therein, * * * the Obligee * * * may construct and complete such building in general accordance with said building loan agreement and plans and specifications as the same may be changed from time to time, and/or may employ a contractor, sub-contractors, architects, superintendent, * * * and the Principal and Surety jointly and severally agree to repay to the Obligee on demand any and all sums of money paid by the Obligee for the purposes authorized by this paragraph, with interest at the rate of six per centum per annum from the time or times of any such payment or payments made by the Obligee."

■ The defendants contend that the plain-

tiff is not entitled to reimbursement for electric current, insurance, steam consumption, taxes, and telephone set forth in Schedule A (Plaintiff's Exhibit 84), because they were not payments made in completing the building.

As to the telephone charge amounting to $204.62, there is force in the suggestion because there is no proof that this service was necessary to complete the building. This is not true of the item of electric current, for obviously current was necessary for light in which to work and for operation of the elevators. For similar reasons the amount paid for steam consumption was necessary to complete the building. Steam was necessary to enable the workmen to work with some degree of comfort, and for preservation of the building.

Expenditures for insurance and taxes are chargeable against the surety, as was indicated in Trainor Co. v. Ætna Casualty Co., 290 U. S. 47, 54 S. Ct. 1, 3, 78 L. Ed. 162, in which it was said: "In the meantime, the uncompleted buildings necessarily lay unrented, subject to expense in the way of taxes, insurance, accumulating interest, etc., deteriorating in quality and steadily declining in value. Petitioner is entitled to be put in as good position in respect of its debt as it would have occupied if the buildings had been completed in accordance with the terms of the undertaking; and this can be done here only by giving it the amount of the difference between the value of the unfinished buildings and their value as it would have been if completed in accordance with the agreement—see Kidd v. McCormick, supra, 83 N. Y. page 398—but exceeding neither the amount due on its debt nor the amount of the bond."

Moreover, paragraph ninth of the building loan agreement provides: "The lender may apply any part of any advance in payment of interest or taxes due and the amounts so applied shall be deemed advanced to the borrower."

It is thus obvious that the building loan agreement specifically contemplated the payment of taxes pending completion. These obligations become the obligations of the surety, for the surety bond provides that, if the surety exercises the right to complete, then the obligee shall place at his disposal any unadvanced amounts of money which would have been received by the principal "with the same requirements * * * as to payment of interest, taxes, insurance, premiums and otherwise, as if such obligations were in fact made by the Principal * * *"; and all moneys required to cure any default, which of course includes a default as to interest, taxes, or insurance, shall be furnished by the principal or surety. The bond states: "The provisions of this paragraph 'Second' shall not in any event relieve the Surety from performance of any of its obligations under this bond, and all monies required to cure any default shall be provided by the Principal and/or Surety."

Paragraph fourth of the bond also imposes this same obligation upon the surety company in respect to taxes, for it provides: "In the event that there are at any time any liens * * * or claims of record * * * against the premises * * * the Surety agrees at its own expense to remove the same * * * and in default thereof, the Obligee may cause such removal * * * by payment * * * and the Surety shall repay to the Obligee any monies expended by the Obligee in payment."

In Kidd v. McCormick, 83 N. Y. 391, cited in Trainor Co. v. Ætna Casualty Co., supra, it is said: "The work needed to complete was one of time; and while the time was running, interest was running also, taxes were levied, insurance was to be kept up, and the premises were yielding no rent. It is plain that to repay him just what he expended to finish the buildings would not make him whole; for he had to pay, besides the cost of building, interest to Granniss, and lose interest on his own mortgages, and pay taxes and premiums."

Defendants also oppose any recovery for interest. This item is in the sum of $312,357.-53, being the amount of interest of which it was deprived from December 16, 1930, to October 1, 1931, the date of completion. This sum represents the interest on $6,575,000 for that period. The effective dates, it will be recalled, designate respectively the date on which the hotel, according to the building loan agreement and surety bond, was to have been completed, and the latter date, the date of actual completion.

The defendants' contention would seem adequately to be disposed of under the authorities cited, Kidd v. McCormick, 83 N. Y. 391, and Trainor Co. v. Ætna Casualty Co., 290 U. S. 47, 54 S. Ct. 1, 78 L. Ed. 162.

The payment to the Otis Elevator Company of $14,500 for finishing the work according to the original contract, and of $395 for removing and reinstalling the pit equipment to permit the waterproofing of the elevator pits, are challenged as being unreasonable. However, had this work been done by some other contractor, the probability is that

396

the practical value of the guaranty clause in the contract between the Central Park Properties, Inc., and the Otis Elevator Company would have been impaired. The elevators were incomplete on December 16, 1930. There was owing from the Central Park Properties, Inc., on the Otis Elevator Company contract and to that company a sum in excess of $80,000, and a conditional bill of sale had been filed by the Otis Elevator Company. Notice of this was given to the sureties, the defendants herein, on January 13, 1931. Nothing was done by the defendants to meet the situation, and the full amount was owing to the Otis Company on April 15, 1931. Bing & Bing, as contractors for the Prudence Company, endeavored to get other contractors to complete the work on the elevators, but for ample reason employed the Otis Elevator Company to complete the installation.

Objection is made to the item of $608, for leveling cement floors. This was certainly a proper item, because the cement specifications required that the floors "be worked to a level and true surface."

Waterproofing of the elevator pits is objected to, but one of the reports shows that, after the waterproofing, water had seeped through.

The window caulking was necessary because it was found that the windows leaked.

Item No. 10, for replacing mirrors and glass, is objected to. The objection in part is sustainable because $345.26 was paid for replacing broken lights. This item is disallowed.

Likewise item 20, a claim for $295, for repair work to kitchen equipment, is disallowed, as it was for repair work without sufficient explanation as to its having been originally defective.

On the other hand, the item of $1,232 for rekalsomining 154 ceilings is justified.

As to repairing the compressor in the refrigerating system, the testimony shows that that was necessary because of original defects.

The charge of $700 for insulating ceiling of steam and incinerator rooms is not justified, and the item is disallowed.

There remains for consideration Exhibit 85, which is an itemization of labor and materials omitted by the Central Park Properties, Inc., and not supplied by the Prudence Company, Inc.; and also substitutions by the Central Park Properties, Inc., of materials inferior to those called for by the plans and specifications.

In paragraph third of the bond is found this provision: "If at any time the Obligee shall take over the work of constructing and completing said building, supplying or installing such equipment, it is understood and agreed that the Obligee does not thereby assume any obligation to complete the said building, and the right of the Obligee to repayment from time to time for moneys expended hereunder, with interest, shall not in any case be affected by any failure on its part to complete the said building, nor shall the Surety be thereby released from its obligation to complete and equip said building."

In Board of Education v. Maryland Casualty Co. (C. C. A.) 27 F.(2d) 20, 21, the action was against the surety on a building contract to recover for the contractor's default. As in the case at bar, a bond was given to assure performance of a contract, or else to respond in damages. The court said: "As the contractor failed to perform, its surety may be called upon at once to pay the damages without waiting for the completion of the building by the owner or another party. Indeed the building may never be completed, for, unless otherwise provided by the contract, the owner is not required to complete the work abandoned by the contractor as a condition precedent to recovery on a bond of assurance, Wills v. Peace Creek Drainage District (C. C. A.) 4 F.(2d) 519; National Surety Co. v. City of Huntsville, 192 Ala. 82, 68 So. 373; Newton v. Consolidated Constr. Co., 184 Mich. 63, 150 N. W. 348; King v. Nichols, 53 Minn. 453, 55 N. W. 604; Simons v. Wittmann, 113 Mo. App. 357, 88 S. W. 791; Cinn. Ry. v. Carthage, 36 Ohio St. 631, yet the surety will be liable for damages occasioned by the breach."

The defendants' position is that there has been no proof offered by the plaintiff that the value of the building has been decreased by the omissions and substitutions set forth in Exhibit 85.

The principle is stated in Jacob & Youngs v. Kent, 230 N. Y. 239, 129 N. E. 889, 891, 23 A. L. R. 1429: "The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value."

The reasonableness of this principle as applied to the facts of this case is obvious. The arrangement between the Central Park Properties, Inc., and the Prudence Company contemplated the advancing of sums aggregating $6,650,000 for the erection of a building ac-

cording to the plans and specifications forming part of the building loan contract; and, if this were not enough, we find in the contract, which measures the rights of the parties to this litigation, a guaranty that the erection will be in strict conformity with those plans and specifications. Any departure therefrom must therefore be at the risk of the obligors, unless indeed they obtained a waiver or a consent in writing, as provided by the contract. There is no proof that either was obtained. Any substantial variance, therefore, and I mean by that any variance other than a mere inconsequential departure from the plans and specifications, must be charged against the obligors. The schedule in question, therefore, presents in the main valid items of damage.

Merely because advances were made by the plaintiff to the Central Park Properties, Inc., after plaintiff's inspectors and even its vice president presumably were aware of the substitutions, neither limits the plaintiff's rights nor enlarges the defendants'. The building loan agreement provides: "The making of any advance or any part of an advance shall not be deemed an approval or acceptance by the Lender or the holder of the mortgage of the work theretofore done."

The defendants argue that article 15 of the general conditions included in the contract made permissible changes in the plans and specifications without the written consent of the plaintiff. But, clearly, those provisions concern the owner, contractor, and architect. It would be against all reason to assume that a lender would permit a borrower to make changes in plans and specifications without affecting the amounts to be advanced, and, of course, would be in entire contradiction of the effect of the clause in the bond that the building be erected in strict accordance with the plans and specifications. Such an interpretation as defendants insist on would vitiate the surety bond.

Other provisions also of the building loan agreement, knowledge of which, of course, is chargeable to and binding upon the surety companies, make clear that article 15 is not intended to relieve the Central Park Properties, Inc., from the strict performance with the plans and specifications. For example, in article eighth therein, the lender is given discretion to withhold advances "if the borrower does not erect said building strictly in accordance with plans and specifications, approved in writing by the lender."

In article seventeenth is the provision that "the borrower agrees to erect * * * according to the plans and specifications prepared by Frank Grad, architect * * * heretofore submitted to the Lender, and amendments thereto made by the Lender in a memorandum dated September 24th, 1929, and initialed by the Lender and Borrower."

Now as to specific items mentioned in Exhibit 85, to which defendants point criticism:

Lighting fixtures: Plaintiff claims $26,900, as the difference between the amount actually spent by the Central Park Properties, Inc., for lighting fixtures and the amount which the specifications called for as lighting fixture expense. Section 4 of the specifications reads as follows:

"Cash allowances. The general contractor shall include in his estimate the following cash allowances for the features enumerated:

"Lighting fixtures, installed, connected, and including connection fees, $50,000."

The defendants' broad interpretation that a discretion was vested in the owner to install equipment at a lesser cost would have considerable force were it not that a standard of comparison had been set up by the parties themselves.

In the loan acceptance, Defendants' Exhibit A, it is stated that: "Said building and the materials and workmanship therein contained, shall be in all respects a first-class apartment hotel."

A. E. Lefcourt, writing on February 5, 1930, to the Prudence Company, said: "I believe that the Savoy-Plaza, where I have been living for the past three years, is a fair example of what is being done and built in up-to-date apartment hotels."

The proof in the case is that the electric fixtures were not equal to those of the Savoy-Plaza. It follows that, if fixtures such as were suitable for a first-class hotel or one that conformed with the standards of the Savoy-Plaza Hotel could have been purchased for less than $50,000, the plaintiff would have had no cause of complaint and would have suffered no damage; since, however, fixtures of an inferior grade were supplied, the item under objection must be allowed.

The item in respect to medicine cabinets follows the same analysis. They were not up to the standard specified, inasmuch as they were inferior in quality as to the mirrors, weight of metal, and enamel work. That item, too, must be allowed.

Neither the plans nor the specifications nor anything in the building loan agreement specifies the installation of interior bathroom radiators; and the item appearing in Exhibit

85, "Radiators omitted in 568 interior bathrooms, $25,000," will not be allowed.

▉ Finally, as to the defense of compromise, it is contended that the withholding of $75,000 on December 5, 1930, for the purpose of completing the building was in effect a compromise between the parties. This is urged as a defense of accord and satisfaction. It may be noted that the defense is not pleaded. On the contrary, paragraph fourth of the defendants' answer treats the item quite differently, in alleging that the Central Park Properties, Inc., deposited that sum with the plaintiff, which was "thereafter appropriated by plaintiff for payment on account of said $6,650,000."

Nor does the proof show that by the deposit of $75,000 from the final payment of $300,000 made by the plaintiff on December 5, 1930, it was by way of accord and satisfaction.

The applicability of Smith v. Alker, 102 N. Y. 87, 5 N. E. 791, Wyckoff v. Meyers, 44 N. Y. 143, Hart v. City of New York, 201 N. Y. 45, 94 N. E. 219, and Bell v. Fox, 138 App. Div. 569, 123 N. Y. S. 310, is not seen.

The case at issue is not one between owner and builder; and there was no undertaking by the Prudence Company that with the amount deposited there was a release of all or any claims. Indeed, the proof would indicate that the amount so deposited was the result of general estimates on the subject of completion. There is no certification by the architect or anybody else in the case at bar that the building was completed. The parties attempted to facilitate the work of completion by effecting the deposit. It is very likely true that the Prudence Company could have withheld the entire $300,000, which it made as a final advance on December 5, 1930, but to have done so might have precipitated the filing of liens by materialmen and subcontractors, who, the evidence discloses, were at the time unpaid. Because it seemed to the Prudence Company the wiser policy to endeavor to stave off disaster is no reason for concluding that, by accepting a deposit of $75,000 for completion work, it was waiving any claim whatsoever. There was no payment by the Central Park Properties, Inc., or any consideration given for an accord and satisfaction. Hudson v. Yonkers Fruit Co., 258 N. Y. 168, 179 N. E. 373, 80 A. L. R. 1052.

In accordance with the foregoing opinion, a verdict in favor of the plaintiff is directed for the sum of $798,416.81 as follows, with interest from May 15, 1934, to the date of the entry of judgment on the verdict:

1. The amount shown in Exhibit 84 (payments in completion) less

| | | |
|---|---|---|
| telephone item of | $204.62 | |
| broken glass | 345.26 | |
| repair work to kitchen equipment | 295.00 | |
| insulating ceilings | 700.00 | $209,454.85 |

together with interest on:—

(a) the sum of $38,080 (first half of taxes) from May 28, 1931 to May 15, 1934     6,773.02

(b) the sum of $19,040 (second half of taxes) from November 28, 1931 to May 15, 1934     2,810.67

(c) the sum of $153,879.73 from October 1, 1931 to May 15, 1934     24,182.30

Total of subdivision 1 .....$243,220.78

2. The amount shown in Exhibit 85 (omissions and substitutions) less the item of $25,000 for radiators for interior bathrooms     160,842.28

together with interest thereon from December 16, 1930 to May 15, 1934     32,909.03

Total of subdivision 2.....$193,751.31

3. The amount of interest lost by plaintiff, as alleged in paragraph XXXVII (3) of the complaint (interest on $6,575,000 from December 16, 1930 to October 1, 1931     312,357.53

together with interest thereon from October 1, 1931 to May 15, 1934     49,087.19

Total of subdivision 3 ......$361,444.72